## Matter of Department of Hous. Preserv. & Dev. of the City of N.Y.

### 2022 NY Slip Op 34924(U)

### June 6, 2022

### Civil Court of the City of New York, Kings County

### Docket Number: Index No. 561/2017

### Judge: Jack Stoller

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: HOUSING PART Q
------------------------------------------------------------ X
In the matter of the application of

DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT OF THE CITY OF NEW YORK,

                Petitioners,                Index No. 561/2017

For a judgment pursuant to Article 7A of the Real
Property Actions and Proceedings and Law, appointing a    DECISION AND ORDER
Court-designated administrator for the premises known as:
138 Wyckoff Avenue, Brooklyn, New York, 11222
Block 03270, Lot 0035 (Kings County).
------------------------------------------------------------ X
PRESENT:              HON.: Jack Stoller
                       Judge, Housing Court

The Department of Housing Preservation and Development of the City of New York

("HPD"), the petitioner in this proceeding, commenced this proceeding seeking the appointment

of an administrator of 138 Wyckoff Avenue, Brooklyn, New York ("the subject premises")

pursuant to RPAPL §769 *et seq.* ("a 7A Administrator").  Wyckoff Heights Properties LLC

("Respondent") appeared and interposed an answer as owners of the subject premises.  The

Court entered into an order to correct ("the Order to Correct").  HPD then moved for the

appointment of an administrator.  The Court held a hearing on HPD's motion on March 22,

2022, May 9, 2022, and May 19, 2022.

**Background**

The Court entered into the Order to Correct on November 20, 2017.  The Order to

Correct identified Respondent as the owner of the subject premises and directed Respondent to

correct outstanding violations of the subject premises, as detailed in an exhibit to the petition

("the Scope of Work"), on or before May 19, 2018.  The Scope of Work details a need for

electrical upgrades, a repair to the cellar, a replacement of a waste system, broken wood floors in

1

[* 1]

the kitchen, broken VCT tiles throughout, mold in Apartment 3R, rotten joists, and a replacement of the intercom system. On default, HPD reserved the right to move for the appointment of a 7A Administrator. HPD made a motion before the onset of the COVID-19 pandemic that was apparently not adjudicated by the time of the pandemic. HPD subsequently moved for the same relief. By an order dated November 16, 2021, the Court granted HPD's motions to the extent of referring the matter for trial.

**The trial record**

The parties stipulated that Respondent owns the subject premises. HPD submitted into evidence a reports showing the results of an inspection from HPD. They showed, *inter alia*, a "C" violation for mold in the bathroom of Apartment 3R and a "B" violation for broken floor tiles in the kitchen of Apartment 3R.[1]

Vazgen Mikaelian ("the Manager") testified that he is employed by the 7A unit of HPD; that he is the construction project manager and has been for seven years; that he inspects the properties; that he inspected the subject premises according to the Order to Correct on March 10, 2022 and March 21, 2022; that two apartments, 3L and 3R, are occupied in the subject premises; that he visited those two apartments on his visit to follow up on the Order to Correct; and that he inspected the subject premises from the roof to the cellar, including public hallways.

The Manager testified that HPD's inspections of the subject premises of Apartment 3L found that top cabinets were not replaced; that a bottom cabinet was replaced; that the cabinet doors malfunction and do not close properly, creating a health and safety hazard and creating problems for food disposal; that the faucets are in an acceptable condition and are not leaking;

---

[1] A class "A" violation is "non-hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(1); class "B" violation is "hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(2); and a class "C" violation is "immediately hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(3). Notre Dame Leasing LLC v. Rosario, 2 N.Y.3d 459, 463 n.1 (2004).

2

[* 2]

that the shower body needs to be replaced because it is leaking and dripping water; that leaking can lead to water damage and a mold condition; that the toilet sink and bathtub fixtures were not replaced; that the toilet is off-level and he could see signs of leaking and a crack on the toilet base; that the sink was replaced; that the sink is back to original condition, water-damaged and detached from the wall; that the sink was not installed correctly; and that the waste lines leak, which erodes the wood cabinet under the sink.

HPD submitted into evidence the following photographs all taken in Apartment 3L on March 10, 2022: one of the kitchen cabinets, depicting doors that cannot close; one of the faucet in the sink, which does not show an apparent problem; one of the vanity, which is peeling, one of the tub showing some discoloration, and one of the bedroom floor, which depicts ruptured tiles.

The Manager testified that the tub was not replaced; that the condition of the tub was rusty; that he saw paint chipping; that floor joists were not replaced; that they needed to be replaced because the floor was sinking and not level; that when the floor is uneven the fixtures in the bathroom and kitchen sink down with the floor, which causes a break in the pipes and leakage; that the floor joists hold structural weight; that "VCT" stands for "vinyl composite tiles"; that VCT were replaced in the bedrooms on top of existing joists and plywood, which has created cracks and peeling and a defective condition; that he saw the VCT in the bedroom; that the VCT was installed on top of a defective subfloor with sinking joists, which caused the condition to return; that VCT's were damaged and cracked; that the joists were supposed to be replaced in order to level out the floor and stabilize it; that he could feel the floor moving; and that the floor is sagging and cracking throughout the apartment.

HPD submitted into evidence the following photographs taken of Apartment 3R on March 10, 2022: one of discoloration in the seal between the toilet and the floor; two of the tub

[* 3]

with what looks like water damage, mold, and discoloration; one of defective wall tiles depicting a gap between the wall and the tub; kitchen floor tiles with a crack in them; and a shower with mold around a window.

The Manager testified that the toilet in Apartment 3R is not a new toilet; that he could see cracks on the toilet base and signs of leaking; that the tub is defective and rusted; that the rust had been painted over; that the paint was covered with mold and chipping and coming off; that the tub has not been replaced, although it has to be; that there are water stains at the plumbing connectors; that the joists were not replaced; that the joists are sagging and the floor is unlevel and he could feel the instability when you walk; that the VCT flooring in the bedroom was replaced on top of existing flooring, which is cracking at the moment; and that in the kitchen ceramic tile flooring was installed to level the floor issue, but that creates extra weight on the floor and so the ceramic tiles were cracked in the kitchen and bathroom area.

The Manager testified that the door in the vestibule is not closing properly; that the locks were not aligned; that the latch is not aligned with the intercom; that the door has to close on its own and lock properly; that the purpose of self-closing hinges is to block fire; that a magnet lock, which is supposed to hold the front entrance door in a closed position to be able to open with the press of a button on the intercom system by tenants to let guests in does not work; that the girder is located in the cellar, running from one side of the wall to another from the front to the rear; that it holds up the structure; that joists rests on top of the girder; that the girder was not repaired; that the girder has to be scraped and replaced at spots; that new joists were not installed at the cellar; that the joists there now are sagging and there is a sagging floor on the first floor; that if you are on top of that floor on the first level of the building you can see the floors sagging down; that the joists hold up the structural weight; that the sagging floors affect the doors, partition

4

[* 4]

walls, fixtures, bathroom in kitchen; that everything sinks down; that the plumbing remains in the same position, which creates broken plumbing and water leaks throughout; that the floors are not leveled now; that there is a flexible hose that connects the stove with the gas line stack that does not look like a new replaced hose; that is has discoloration and is bent at spots; that the hose is defective, which creates a potential for a gas leak inside the apartment; that a waste line is the pipe that receives used water from the fixtures; that Apartment 3L did not have a new waste line, shown by signs of leaking water and areas where you can see the pipe you can see that it is rusted at spots and it requires replacing; that the underground system was not replaced; that it is a continuation of the waste line that takes the used water from the building to the street; that the underground system now is operating but you can see the water leaks throughout the building; that water leaks lead to water damage throughout and the mold issue; and that a new waste line was not installed in Apartment 3R.

The Manager testified that he went to the subject premises on March 21 and that he did not observe any changes from March 10 to March 21.

The Manager testified on cross-examination that he has worked with HPD for seven years; that he did not inspect the subject premises in 2018; that he was first in the subject premises on March 10, 2022; that he can see that the bottom portion of the cabinet was replaced and the top portion was not, by the condition and the style of the cabinet and the paint history; that old does not necessarily mean bad; that old can be functional; that the cabinet that was not replaced was not functional; that the doors are not closing properly, which creates a health and safety hazard with a potential for infestation; that the old doors were the same type as the cabinet; that he does not know who created those conditions in the cabinets; that he looked at the hinges and the hinges look like they have been painted over several times; that the doors are not

[* 5]

bigger than they should be because of the multiple layers of paint; that the remedy for this condition is to replace the cabinet; that he does not know if the doors would close properly if the paint was removed from the hinges; that the faucets were replaced; that there was no problem with the faucets; that the shower body is leaking; that he saw evidence of leaks; that a defective shower body faucet caused the leak; that in Apartment 3R he turned the water on and when he closed it, it was dripping water and he could see the orange stains on the tub; that he did not inspect the apartment below Apartment 3R for evidence of leaks; and that he did not know if the shower body could be repaired.

The Manager testified on cross-examination that he has experience in construction; that he was in construction, doing renovation and alterations before coming to work for HPD; that a shower body could be repaired, although he is not sure if this one could be repaired; that he did a visual inspection and saw mold all around the bathroom in the cabinets and ceilings and walls and it was all dark brown or black or a yellowish color; that he took photographs of these conditions; that the mold he saw in the shower in Apartment 3R was from leaking shower faucets and poor ventilation; that the photographs do not show a leaking water source; that there was no ventilation other than the window in the bathroom of Apartment 3R; that mold has to be abated by a proper mold abatement process; that ammonia or Windex will not abate the mold; that he saw a dripping faucet in the shower body; that a dripping faucet was supposed to be replaced; that a faucet could be repaired; that a sink was replaced in Apartment 3L; that he knows the sink was replaced because it looked new and had a relatively new cabinet; that it is back to its condition because a leak in the walls caused a separation; that the sink is separating from the wall and the sink is unlevel and misaligned; that he did not see evidence of leaking; that he saw separating of the walls from the vanity; that fixing that means that the vanity has to be replaced

6

[* 6]

because it is already water-damaged; that the sink could still be used; that he tried to close the cabinet doors but they did not close; that there was no obstruction; that he does not know why it was not closing properly; that a faucet in in Apartment 3L was in good condition; that the sink was installed two inches from the wall; that the sink was plastered and corked several times and in a cracking condition, detaching from the wall; that the filler could be removed and the sink could be installed level with the wall; that at this point the sink is misaligned with the vanity on the wall; that the sink and the faucet can be kept, but the vanity has to be replaced and the sink has to be reinstalled; that laminate over wood is peeling; that the bottom of the cabinet and the rear was also misaligned; that the wood behind it was water damaged and falling behind and soft; that rust in the tub was on the insides and outsides and it was freshly painted-over; that the paint was chipping off and cracking off; that the tub was not leaking when he inspected; that he turned the faucets on and did not see a leak; and that reconditioning could solve the problem with the tub.

The Manager testified on cross-examination that he inspected the floor joists; that he could not see the floor joists physically because they were inside the structure; that he determined that they were defective due to sagging floors and because he could feel the floors moving; that instead of fixing the joists, the VCT and ceramic tiles that were installed are now cracking, which creates trip and cut hazards; that nothing else short of joist replacement could be done; that floor joists cannot be reinforced; that he did not know how old the toilet is; that the problem is the crack in the base of the toilet, a crack in the tiles underneath the toilet, an unlevel base for the toilet, and signs of leaks and mold on the silicon that was placed around the toilet; that the crack is in the front of the toilet; that he flushed the toilet and did not see leaking; that there is silicon filler at the base of the toilet which is used to secure and seal toilet to the tile; that

7

[* 7]

filler is sold commercially; that the filler that is there is appropriate; that the leaking comes from the lead-bend pipe, although he did not know when; that the leak would not be apparent to tenants because the leak is not excessive in a way that you can see; that it could be a small minor leak that feeds the cement, resulting in stains and a cracking of sealant and a mold condition around the toilet; that it would not necessarily drip down to the floor below; that he turned the tub on; that he found it to be leaking in the waste line, which is in the photograph; that the waste line is both vertical and horizontal; that the floor is covered in mold and water-damaged; that the tub could be repaired; that the portion of the sink-based cabinet that is touching the tub also separates from the sink and is defective due to the water leak; that it is a construction problem; that one should not install tiles on a stand-alone tub when the floors are sinking, as that creates tiles that do not adhere properly and come off; that tiles should not have been installed, as they create a cut hazard; that there is an intercom system but it is not connected to anything; and that the magnet lock is not connected to the intercom system and needs to be replacement or repaired.

Raj Bhayana ("the Landlord") testified that he is a doctor; that he is the owner the subject premises through a corporation of which he is the sole owner; that the subject premises is a six-unit building with railroad apartments; that Apartments 3L and 3R are occupied; that the rest of the subject premises is vacant; that he has been an owner for six years; that when his tenants need something they get it done; that the tenants are rent-stabilized; that the tenants have not paid him anything; that he has complied and repaired what they have asked each time; that this case has been pending for three or four years; that the contractor has addressed violations; that he is not aware that the same number of violations has continued; that he has hired a contractor to get work done; that the boiler was replaced; that there was a questionable issue with the plumbing which was replaced; that the toilets were replaced; that cabinets were replaced; that flooring was

8

[* 8]

redone; that doors were replaced; that the staircase was repaired; that the intercom system was repaired two times because HPD changed the locks; that he was at the subject premises the day before his testimony and found that when he pressed the button on the intercom in the two occupied apartments that the intercom was working just fine; that he gained entrance to the apartments by knocking on the tenants' doors; that he spoke with the tenants; and that he inspected the apartments and took photographs.

Respondent submitted into evidence photographs of Apartment 3L taken on May 8, 2022 of a kitchen cabinet countertop, a vanity, a toilet, a shower head, and a faucet that look like they are in good condition, and photographs of Apartment 3R taken on May 8, 2022 of a kitchen cabinet, a range, a vanity, a toilet, a faucet, and a floor, which also look like they are in good condition.

The Landlord testified that he was told that there were no doors shutting in kitchen cabinets; that ceramic tiles are in perfect condition; that faucets are working perfectly and have no leaks; that he was there with contractors and a handyman; that he checked the cabinet doors and they were working in good condition; that the bathroom fixtures are in perfect condition; that the base of the vanity is sealed; that he did not open and close the vanity doors; that he used the faucets; that they were working perfectly; that there was no leak in the faucet; that he inspected the toilet in Apartment 3R, which is in perfect condition; that he looked around the base of the toilet which looked fine to him; that he did not check the shower head himself; that he inspected the toilet in Apartment 3L to make sure there were no cracks and that it was working fine; that it is a new toilet; that both toilets have been replaced within the last year or two; that the bathroom faucet in Apartment 3R is working fine; that he checked that too; that the stove is working perfectly; that the kitchen cabinet doors and faucets were working fine, which he saw because

9

[* 9]

they opened and closed the cabinets and the faucets; that his contractor installed the intercom three or four years ago; that HPD changed the locks, which changed the intercom; that he tested the intercom to see if it was working by pressing the button; that he made sure that the intercom opened the door when the button was pushed; that the photographs are of the bathroom ceilings because there is no mold there; that he looked around the entire bathroom; that there is no mold anywhere; that he had the flooring changed in all apartments three or four years back; that the tiles and baseboard were replaced; that he inspected those floors; that he did not go into the bedrooms but the kitchen and the other room had stable floors; that there is a slight indentation of the floors but they are stable; that there was no movement or cracking when he walked on the floor; that he had the flooring inspected by engineers on November 11, 2021; that there was a violation regarding the joist being unstable; that he felt that the joist was stable; that he had an engineer come in two times, both three years back and recently; that he got a report; that he requested that the engineer come to Court but he is out of the country; that he showed violations to the contractors and went over them item by item; that floor joists were not repaired because they seemed to be stable according to the opinion of an engineer that he had retained; that there were many things that are not good and not working; that they wanted to change the skylight but there was no reason to change it because it was working fine; that there is no leak from the skylight; that he did not recognize the vanity depicting in HPD's photograph in evidence; that the vanity was replaced two or three years back so there may be some wear and tear but not what the photograph depicted; that he did not see a condition depicted in HPD's photograph in evidence of mold in a floor near a tub; that tenants do not call him with complaints; that they only call HPD directly; and that he does not know the Manager.

10

[* 10]

The Landlord testified on cross-examination that HPD replaced the boiler; that the shower heads were in good condition based on tenants' conversation; that he did not turn the shower head on; that he inspected the oven in Apartment 3R; that he saw the gas line; that the gas line was there; that he could not see the gas line; that the oven blocks the gas line; that there was no reason to take a picture of the window because he was told that there was mold in the ceiling; that there was no evidence of any leak; that he always asked for a location of mold and he was told of a location and he could not see mold there; that he tested to see if the tenants could hear the buzzer; that he believes that he did everything required from the Order to Correct except the floors; that he repaired a maintenance girder; that that was a structural repair; that his structural engineer said that they had to repair that so they did it; that it was one girder that needed additional support; that he did not get a permit from DOB; that the intercom is the only thing he worked on since March 22, 2022; and that when he called the certified mold assessor six months before his testimony, they said that there was no mold.

The Landlord testified on redirect examination that he checked for mold and that he did not see mold.

**Discussion**

In a proceeding pursuant to RPAPL §769 *et seq.* such as this one, upon a finding of, *inter alia*, an infestation by rodents, a lack of electricity, or any other condition or combination of conditions dangerous to life, health or safety, which have existed for five days, RPAPL §770(1), the Court is empowered to, *inter alia*, direct that rents be deposited with an administrator appointed by the Court pursuant to RPAPL §778(1) to be used to remedy the conditions. RPAPL §776(b).

11

[* 11]

While the original Scope of Work included a need for electrical upgrades, the violations in evidence and the Manager's testimony did not prove that this condition remained a problem. Nor does the evidence show a rodent infestation, the other condition specifically cited in the statute. Of the conditions cited from the Scope of Work, the most serious are the structural issues.

The Scope of Work specifically cited rotten joists. Respondent does not dispute that he did not replace the joists. While Respondent claimed that he received a professional opinion that joist replacement was not necessary, Respondent did not submit testimony from a witness with personal knowledge, despite an accommodation from the Court including three trial dates spread out over the course of two months. Without such evidence, Respondent cannot effectively rebut HPD's evidence that weak joists result in uneven floors, a problem only exacerbated by the weight that the installation of ceramic floor tiles added to the floors. The violations and photographs of broken VCT tiles further evinced the effects of sagging floors. While the broken tiles have the potential to create a cut hazard, more alarmingly, they could indicate a more serious structural defect to the subject premises.

Respondent attempted to dispute the presence of a structural issue that the joists presented with testimony that he had work on a girder in the cellar done. However, Respondent did not obtain a permit from DOB. It shall be unlawful to repair the structure of a building without a permit. N.Y.C. Admin. Code §28-105.1. While minor alterations do not require a permit, "minor alterations" are defined so as to specifically exclude modifications that have some effect on the structural safety of a building. N.Y.C. Admin. Code §28-105.4.2.1. The Court therefore draws the conclusion that Respondent either illegally worked on the girder without a permit or that Respondent did not in fact address the structural problem in the subject premises.

12

[* 12]

While the waste system in the subject premises does not rise to the same level of concern as the joists, the Manager's unrebutted testimony proved that Respondent did not correct the waste system. The parties had some disputes about the state of mold and the intercom in the subject premises, but even assuming *arguendo* that there was mold in the subject premises and that the intercom did not work, those conditions do not rise to the level of significance of endangerment of tenants' life, health or safety to warrant the appointment of a 7A Administrator. Feliciano v. KIA, 1990 N.Y. Misc. LEXIS 794, at *1 (App. Term 1st Dept. 1990), MacLean v. 7 Ave. Garden, LLC, 44 Misc.3d 1208(A)(Civ. Ct. N.Y. Co. 2014).

Be that as it may, the uncorrected floor joists and dubious status of the girder repair present the kind of endangerment to tenants' safety that merit the appointment of a 7A Administrator, In re Garcia, 2018 N.Y.L.J. LEXIS 2871, *59 (Civ. Ct. Bronx Co.), particularly given the extended duration of this matter. To put a finer point on it, if the Court dismissed this proceeding, the Court has no confidence that Respondent will safely and lawfully correct the floor joist condition, a condition that is neither transitory nor sporadic. Oyola v. Combo Creditors, Inc., 64 Misc.2d 727, 728 (Civ. Ct. N.Y. Co. 1970). The structural issues posed by the joists pose a non-trivial detriment to the safety of the tenants.

Accordingly, it is ordered after trial that the appointment of a 7A Administrator is warranted. The Court shall contact the parties to resolve the selection of a 7A Administrator and to settle a judgment.

This constitutes the decision and order of this Court.

Dated: June 6, 2022
     Brooklyn, New York

_____
HON. JACK STOLLER
J.H.C.

APPROVED
JSTOLLER , 6/6/2022, 10:33:38 AM

13

[* 13]